## Sparks, for use, Appellant, *v.* Pittsburgh Co.

[Marked to be reported.]

*Contract—Oil well—Evidence—Construction of agreement.*

Plaintiff offered to drill an oil well upon any one of defendant's several leases near Ellwood that might be selected. He further proposed as follows: "If you decide to drill any more wells upon said leases or in the vicinity up to the number of five I am to have the contract of erecting the rigs and drilling the wells at the prices above named." At the end of the proposition was written "Accepted, contract to be drawn in accordance with the above proposition or bid;" and the following words were then added by the president of defendant company: "This is about right and will be satisfactory to the Pittsburgh Company." Without any contract being executed, plaintiff sunk the first well which proved a dry one, and defendant abandoned the enterprise of sinking any other wells on about one thousand acres of contiguous lands which they had under lease. They however subsequently sank wells about two miles distant from the territory thus abandoned. *Held:*

1. That the proposition of plaintiff was not intended to be the actual agreement, but simply the basis of one to be subsequently perfected by a contract properly prepared.

2. That the fact that the first well was sunk and paid for could not operate to turn the proposition to sink the others into a contract, since a future agreement for the sinking of them was clearly contemplated to be prepared.

3. That the sinking of the well by defendants upon lands two miles distant from the leased territory covered by the proposition was not in its " vicinity," and was not therefore a breach of the proposition.

4. The use of the word "vicinity" in the written instrument, being a relative term used differently according to its subject, cannot operate to change the duty of the court in the interpretation of it, and transfer that duty to the jury.

Argued Nov. 7, 1893. Appeal, No. 260, Oct. T., 1893, by plaintiff, George W. Sparks, for use Jarecki Mfg. Co., Ltd., from judgment of C. P. No. 3, Allegheny Co., Aug. T., 1892, No. 456, on verdict for defendant. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and THOMPSON, JJ.

Assumpsit for breach of contract to sink gas wells.

At the trial, before KENNEDY, P. J., it appeared that plaintiff made to defendant the following proposition in writing:

" PITTSBURGH, Pa., March 9th, 1892.

" Dear Sir:—I hereby propose to build for you a carpenter's rig and drill a well, upon one of your leases, located near Ellwood City, Lawrence county, Penna., upon the following terms and conditions, viz.:

" Rig. Erect and build one carpenter's rig complete for the sum or price of $450, furnishing all the material for same.

" Well. Drill one well upon any one of the leases you may select, down to the Berea sand; furnish all the machinery, boiler and engine, excepting casing, which you are to furnish and deliver at the well, for the sum or price of $1 per foot.

" If you decide to drill any more wells upon said leases, or in the vicinity, up to the number of ten (10), I am to have the contract for erecting the rigs thereon and drilling said wells at the same prices above named. If a rig should be moved from one well to another location, you to pay me the sum of $150 for moving the rig and erecting same, [and $75.00 for moving the boiler, engine and other materials connected therewith.]

" Payments. Rig to be paid for when completed. Well to be paid for when completed.

" G. W. SPARKS.

"March 9th, 1892, accepted, contract to be drawn in accordance with above proposition or bid."

This was submitted to H. W. Hartman, president of defendant company, and he returned it to J. A. Tomlinson, defendant's agent, with the following indorsement, after changing "ten" to "five" and striking out the part in brackets:

"J. A. T.:

"This is ab't right & will be satisfactory to The Pb'g Co."

Plaintiff sunk the first well upon one of the leases, and was paid for the same. This well proved a dry one, and defendant abandoned the enterprise of sinking any wells upon about one thousand acres of land which it had under lease in the immediate neighborhood. Subsequently, however, defendant sunk a number of wells about two miles distant from the abandoned territory. Plaintiff claimed to recover damages for the loss of profits arising from the refusal of defendant to allow him to sink these wells.

Tomlinson testified on the trial: "Q. What did Mr. Hartman say to you when he returned to you the paper? A. Why, he told me to give it to John G. McConnell and have John make out the contract. Q. Told you to give it to McConnell and for him to make out a contract? A. Yes, sir. Q. Did he say anything to you about having Sparks agree to it? A. Why, Mr. Sparks had agreed to it; he had signed it at that time. Q. What else did he say to you about the commencement of the well? A. He said he was in a great hurry for them to start up, and he would like to have them go that day, and Mr. Sparks said he couldn't go until the next morning. Q. What did he say about waiting for the contract, if anything? A. He said that could be done any time by Mr. McConnell. Q. Said it could be done any time? A. Yes, sir. Q. And that he should go ahead and drill the well? A. Yes, sir. Q. Did you tell Mr. Sparks, or give this message to Mr. Sparks? A. I did so; yes, sir. Q. What did Mr. Sparks say? A. He said he would start the next day. Q. Did he start the next day? A. So I am informed. Q. Who put this indorsement upon the contract? A. Mr. Hartman. Q. You say this indorsement was written by Mr. Hartman? A. Yes, sir. Q. And when he gave you this paper he told you to have Mr. McConnell draw up a contract accordingly? A. Yes, sir. Q. And to have Mr.

Sparks go to work immediately and drill a well? A. Yes, sir. Q. And not to wait for the contract? A. Yes, sir."

Plaintiff testified: " Q. When this proposition was returned to you by Mr. Tomlinson what did he say with reference to the drawing of a contract? A. He said to leave it at Mr. McConnell's office and get the contract drawn up. Q. What did he say about beginning work? A. He told me that Mr. Hartman said that he wanted me to go up there at once, and not wait on the contract, that I could get it any time afterwards. Q. When did you begin work? A. Why, I went up the next day after I signed that proposition and handed it in to Mr. McConnell to form the contract. I went up a day or so after that and seen Mr. Hartman, and he told me where to locate the well, and I got it drawn off on a piece of paper, and got it located, and came back down and took my men up and shipped my tools up, and got started as quick as I could. . . . Q. Did you have any conversation with Mr. Hartman afterwards about the contract? A. Yes, sir; I seen Mr. Hartman at Ellwood once about it. Q. What did you say to him about it? A. He asked me if I had got it drawn up yet, and I told him that I had seen Mr. McConnell, and that he hadn't got it drawn yet, but said he would in a few days. Q. What did Mr. Hartman say to that? A. He told me he wanted me to get it drawn up. Q. Was there anything further said by Mr. Hartman at any other time about the contract? A. I don't remember anything more at that time. Q. Did Mr. Hartman ever bring a contract to you and ask you to sign it? A. He took me into his private office one time at Ellwood and sat down to write out a paper himself, and I told him Mr. McConnell had the proposition that we signed and we had better let him make the contract according to that. Q. What did he say to that? A. Well, he said all right, he would wait on that."

The court gave binding instructions for defendant.

*Error assigned* was instructions, quoting them.

*A. Leo Weil,* for appellant.—If a contract is to be reduced to writing, it is not complete until that writing is made and signed: 1 Pothier on Obligations, 110; Boulets v. Gravier, 6 Martin, 574; Montague v. Weil, 30 La. An. Rep. 52; Miller v. Mc-

Manis, 57 Ill. 130 ; Brown v. Finney, 53 Pa. 374. Whether or not it was the intention of the parties to make the perfection of the agreement depend upon the writing, to be subsequently drawn, and to have no effect until then, can be ascertained only from the proposition, the action and the statements of the parties. The proposition itself and the indorsements give no conclusive answer to this question. The evidence shows that it was in terms agreed not to wait for the formal contract, and that they did not wait.

Even if the parties had at first intended to make the drawing of the contract a condition precedent to the accepted proposition becoming obligatory, they waived this condition.

Vicinity does not denote so close a connection as neighborhood. A neighborhood is a near, immediate vicinity. The houses joining a square are in the neighborhood of that square ; those which are somewhat further removed are in the vicinity of that square : Coyle v. R. R., 27 Mo. 584 ; Peters v. Bourneau, 22 Ill. Ap. 177 ; Woods v. Cochrane & Smith, 38 Iowa, 484.

Vicinity being a relative term must be interpreted by the facts and circumstances to which it has relation, and its interpretation is for the jury.

*John F. Sanderson, Walter Lyon* and *Charles H. McKee,* with him, for appellee.—What vicinity is, depends upon the situation of the parties with reference to the subject-matter, and upon the situation of the subject-matter, is conceded, and therefore it is not necessary to deal with the term vicinity, as a general term ; but as the term was used in a written instrument, and as the construction of written instruments is a question for the court, and not for the jury, and as the application of the term to the subject-matter depended upon plaintiff's undisputed evidence, the jury had no function to perform.

The agreement was sufficiently definite and complete as to the well which was drilled ; both parties agreed that the drilling of that well should proceed without regard to the preparation of a formal contract. It is equally clear that the parties insisted upon a formal contract relating to the five wells. Undoubtedly there could be no recovery for the drilling of the first well on its completion, without reference to whether the other wells were completed : Brown v. Finney, 53 Pa. 374.

OPINION BY MR. JUSTICE THOMPSON, December 30, 1893 :

Appellant's proposition to appellee was to erect a rig and to drill a well, the rig to be erected for the sum of $450, the well to be drilled down to Berea sand, upon any one of the leases that might be selected, to be for the price of one dollar per foot, to be paid for when completed, and the boiler and engine, except casing, to be furnished by him. It is then proposed by him as follows, viz.: "If you decide to drill any more wells upon said leases or in the vicinity, up to the number of five, I am to have the contract of erecting the rigs and drilling the wells at the prices above named." At the end of the proposition is written "Accepted, contract to be drawn in accordance with the above proposition or bid," and the following words are then added: "This is about right and will be satisfactory to the Pittsburgh Company." Without any contract executed in pursuance of this proposition, appellant sunk the first well upon one of the leases and has been paid for the same. This well proved a dry one, and appellee, which had in its neighborhood leases upon about one thousand acres of land, and for the development of which the well in question was sunk, gave them up and abandoned the enterprise. It however sunk a number of wells near Ellwood, some two miles distant from the territory thus abandoned. Appellant claims damages for the loss of profits arising from the refusal of appellee to allow him to sink those wells. This claim is therefore based upon an alleged contract and its breach.

The appellant's contention is that the proposition itself constituted the contract, and the sinking of those wells at Ellwood the breach of it. The language at the end of the proposition, to wit: "contract to be drawn in accordance with the above proposition or bid," and "this is about right and will be satisfactory to the Pittsburgh Company," clearly imports that it was not intended to be the actual agreement, but simply the basis of one, to be subsequently perfected by a contract properly prepared. This appears to be apparent from the words used, "if you decide to drill any more wells upon said leases, or in the vicinity. . . . I am to have the contract." The proposition was that, when the decision should be reached to sink the five wells upon the leases or in the vicinity, appellee was to make a contract with appellant for their drilling. As the

time of such decision was not fixed, as the order of sinking the wells, whether together or successively, was not determined, as the points of locality were not settled, as the times for completion were not designated, and the modes of payment were not specified, it is manifest that this proposition was not intended as a complete contract, but that it was tentative and was only to become a contract binding upon the parties by a written agreement when properly prepared. This is apparent from the proofs adduced by the appellant himself. He testifies that the president of the appellee company took him to his private office and sat down with him to write the intended contract, when he, appellant, told him that McConnell had the proposition and that he had better prepare the contract. Mr. McConnell testified: " That Mr. Tomlinson, the agent of appellee, and Mr. Sparks, the appellant, brought him the proposition after it had been altered, and that Mr. Sparks said he was going up to the leases to be absent a week or ten days, and asked him to have the contract ready by his return,—that the proposition was left by Sparks for the purpose of preparing a contract; " and Mr. Tomlinson testified that the president of the company told him to give the proposition to Mr. McConnell to have him prepare a contract. It is thus plain that the proposition did not contemplate the preparation and execution of an agreement simply for the purpose of more authentic proof of it, but was only an expression of what was to be the basis of an agreement to be prepared to represent the final meeting of their minds upon the subject. It has not been perfected by any contract which is binding upon the appellee.

It is contended that the proposition was not severable and that appellant, without such written contract and with the assent of appellee, having sunk the first well and having been paid for it, no written contract was intended to be required for the sinking of the five other wells. The first well was to be sunk at all events, and upon its success depended the operations upon the one thousand acres leased. The appellee was anxious to ascertain whether oil existed beneath that territory, and requested appellant to go on in advance of the execution of the written contract. By such parol arrangement of both parties the work was done. While it was being done, they sat down to draw the agreement contemplated, but at the suggestion of the appellant it was referred to counsel to prepare it, who it seems failed

to do so.   The sinking of the first well was to be done promptly and the five others were to be sunk only in case appellee should decide to sink them.   The work of sinking that well was distinct from that connected with the other five wells which, as it had not decided to sink them, were not then to be sunk. The fact that the first well was sunk and paid for under such circumstances cannot operate to turn the proposition to sink the others into a contract, when a future agreement for the sinking of them was clearly contemplated to be prepared.   As to the first well, the work was done with the assent of both parties, without the preparation of the written contract intended, and was paid for.   As to the five other wells, the negotiations have not been completed by the preparation and execution of the contract contemplated.

Assuming, however, that the proposition be treated as an actual agreement and not as tentative, there is no fact showing any breach of it.   The proposition was in reference to sinking wells on the leases or in the vicinity.   The leases referred to were those on the land situate some two miles north of Ellwood, and the vicinity intended was in their immediate neighborhood. The proposition is to be construed with regard to the subject-matter.   The parties were contracting for a well to be sunk presumably to be followed by others upon this new and undeveloped territory, and necessarily " vicinity " must be construed with regard to it.   It is ingeniously argued that " vicinity " is a relative term used differently as to subjects, as when applied to planets with reference to each other involving vast distances, as when applied to cities in regard to each other covering many miles, and that, as it was thus an indefinite term when used, its limits in the present case should have been determined by the jury.   The argument may be plausible but it is not substantial. The use of a word in a written instrument which may have in some uses different effects cannot operate to change the duty of the court in the interpretation of it, and transfer that duty to the jury.   The construction of the instrument is for the former and not for the latter.   The sinking of the wells by appellee upon lands owned by it near Ellwood, two miles distant from the leased territory covered by the proposition, was not in its " vicinity " and was not therefore a breach of the proposition.

Judgment affirmed.